# EXHIBIT K

(Pursuant to the DCO only hard copies will be provided)

| | | |
|---|---|---|
| MARIANITO RUIZ | ) | UNITED STATES DISTRICT COURT |
| | ) | DISTRICT OF NEW JERSEY |
| Plaintiff | ) | CAMDEN VICINAGE |
| | ) | |
| | ) | CIVIL ACTION NO: 15-cv-03304 (RBK) (JS) |
| v. | ) | |
| | ) | |
| | ) | |
| CORRECTIONAL OFFICER | ) | |
| JERRY STRETCH, *et al.* | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## Expert Report of Jeffrey S. Carter

1. My name is Jeff Carter. I have been actively involved in Corrections and Jail practices since February 1999. I retired on December 1, 2018 as the Deputy Director of the Division of Community Corrections, otherwise known as the Fayette County Detention Center (FCDC) located in Lexington, Ky. FCDC is a 1280 bed correctional facility housing local, state and federal Mr..

2. My formal education includes a Bachelor of Science Degree in Corrections and Juvenile Services from Eastern Kentucky University located in Richmond, Ky.

3. I began my career as a Correctional Officer in 1999 working in the Bureau of Custody before I was then transferred to the Bureau of training as an Academy Instructor. Along with my training staff, I trained over 700 recruits as well as provided annual in-service training for approximately 270, sworn and unsworn, staff for the Division.

4. As an academy instructor, I have been certified to teach in many areas relating to Corrections such as Pressure Point Control Techniques, CPR, HIV/Blood Borne Pathogens, Basic First Aid, OC Pepper Spray, Pistol Instructor (NRA), Shotgun Instructor (NRA), Glock Pistol Armorer as well as Investigating Sexual Assaults in a Correctional Setting.

5. Beginning in 2003, I have presented training in the areas of Use of Force, Mental Health and Suicide Prevention, PREA (Prison Rape Elimination Act), Internal Affairs and Officer Ethics, Direct Supervision for Jails and Preventing In-Custody Deaths. I have presented this training to the Kentucky Jailers Association, as well as, the American Jail Association at various training conferences throughout the state of Kentucky, as well as, in Sacramento, Ca.

6. In January 2005 I was appointed as Director of Three Forks Regional Jail. This was 154-bed regional jail housing for Lee, Wolfe and Owsley counties in eastern Kentucky. I supervised 27 staff in the day to day operation, insuring proper care, custody and control of the 200 (State/Local) Mr. population. I revised the Policy and Procedure manual in conjunction with federal and state law. Implemented a rank structure among staff, not only clarifying supervisory roles but also, encouraged staff to reflect leadership qualities in their pursuit of advancement. I prepared a grant request which was successful in obtaining a twenty (20) bed renovation utilized for a residential drug treatment program for incarcerated offenders.

7. In June 2005 I returned back to the Fayette County Detention Center as a custody Sergeant where I was promoted to the rank of Lieutenant in November 2005 and assumed the duties as the Facility Safety Officer.

After being promoted to Captain in 2007, I commanded the Professional Standards Bureau at FCDC where, after completing a 24-hour advanced course in Interviewing and Interrogating from John E. Reid and Associates , as well as, a 40 hour Police Internal Affairs course from the Institute of Police Technology and Management, I

was in charge of the Internal Affairs, Training, Facility Safety and Gang Intelligence units within the division.

8.  As Commander over the Internal Affairs Unit I investigated or supervised over 200 investigations on staff as well as contractor misconduct.

9.  In 2012 I was asked to complete a Security Audit for the Franklin County Regional Jail in Frankfort, Kentucky.  As part of this review, I assisted in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in jail operations.

10.  In 2013 I was invited, as a guest instructor for "Internal Affairs in the Jail Setting", to Eastern Kentucky University.

11.  As a Certified instructor for "Investigating Sexual Assaults in the Correctional Setting", I have trained over 500 sworn staff in completing these investigations within their own facilities nationwide.

12.  From 2007 through 2018 I was trained, certified and practiced as a Deputy Coroner in Breathitt County, Kentucky.  I assisted or directed investigations of deaths occurring within jurisdiction as required by law.  I lead activities of staff investigators involved with performing Post Mortem Exams, conducting pathological and toxicological analyses, while investigating circumstances of deaths in order to determine cause and manner and fix responsibility for accidental, violent, or unexplained deaths, or contract for such services with outside physicians, medical laboratories, and law enforcement agencies.

13.  After being promoted to the rank of Major in 2013, I oversaw vendors and contractors who provided services to the Division of Community Corrections such

as Medical, Mental Health, Food Service, Mr. Commissary, as well as, all capital projects related to the Division. My responsibilities were to insure the services provided met the contractual and legal expectations in the performance of their obligations.

14. In 2014 I was transferred to Custody and Master Control Bureau where I supervised over 200 staff who were responsible for the day to day supervision of the 1280 population. I was responsible for the administrative management of personnel whose primary duties and responsibilities are the custody, care and control of housed at FCDC. This included managing personnel action and employee performance issues, establishing appropriate staffing levels, developing, updating and implementing policy and procedures.

15. After two years being Custody Bureau Major, I assumed command of the Administration Bureau in August 2016, where I supervised staff who maintain and enhance the organization's human resources by planning, implementing and evaluating employee relations and human resources policies, programs, and practices, as well as, oversaw the recruiting of new staff for the agency.

16. In November 2016 I was promoted to Deputy Director of the division. I supervised the 377 sworn and non-sworn staff in the daily operations of the facility until my retirement December 1, 2018.

17. I currently (Since 2016) am a National Jail Consultant for Legal & Liability Risk Management Institute (LLRMI) where I conduct Expert Witness and consultation around the country. I also provide training on jail issues for LLRMI, as well as, Public Agency Training Council (PATC) nationwide.

18. I have graduated from the top leadership courses offered by the National Institute of Corrections located in Aurora, Colorado such as; Executive Leadership Program (8 months), Jail Administration Course (40 hours), and Correctional Leadership Development (70 hours).

19. I became a Certified Jail Manager (CJM) through the American Jail Association (AJA) in April 2018.

20. I have made references to the New Jersey Internal Affairs Guidelines. Noted in the Introduction of the New Jersey Internal Affairs Guidelines on page 5 it states: *The revised policy contains several mandates that, at the Attorney General's direction, every law enforcement agency must implement. However, the manner in which these agencies must implement these mandates is a decision that is left to the individual law enforcement agency's discretion. For instance, every agency must establish an internal affairs function. But the manner in which the mandate is satisfied is a decision left to the discretion of the individual agencies. Individual agencies shall decide, based on the characteristics of their jurisdiction and the workload of their agency, whether the internal affairs function is a full- or part-time unit and how many officers are assigned to work in that unit.*

21. The action that I have been retained to review began on April 22, 2013 when the Special Investigations Division (SID), of the New Jersey Department of Corrections, received a referral from Principal Investigator Crotty at the Bayside State Prison located at 4293 Route 47, Leesburg, NJ 08327.

22. The material I was provided in to review in this case is listed as follows:

- Complaint
- Amended Complaint

- Answer
- BSP Administrative Investigation Report
- Deposition Transcript - Hepner
- Deposition Transcript – Soltys
- IAU Knights Far, Administrative Investigation Report
- Preliminary Incident Report
- Video of Plaintiff's escort from shower
- Video of Plaintiff's escort from Detention
- Interview of Marianito Ruiz
- Interview of Sgt. Matthew Arrowood
- Interviews of Lauren Reeves, Peter Cooper, and Stephen Weldon
- Interview of Sgt. M. Ryan BSP 7/22/13
- Ruiz- Face Sheet Report (Redacted)
- Ruiz – Progress Notes Report (Redacted)
- SID Documents (4 parts)
- SID Files/Retrieved Reports Re: IM M. Ruiz
- SID IMPs
- SID Report
- Deposition Transcript – Matthew Arrowood
- Deposition Transcript – Lauren Reeves
- Deposition Transcript – Thomas Togno
- Deposition Transcript – Louis Marcucci
- Deposition Transcript – Stephen Welden
- Deposition Transcript – Michael Ryan
- Deposition Transcript – Jerry Stretch
- Deposition Transcript – Kevin Manning
- Deposition Transcript – James McCabe
- Deposition Transcript – Michael Wohlfert
- Deposition Transcript – Marianito Ruiz
- Expert Report of Theresa Lantz- April 30, 2019
- Expert Report of Mickie W. McComb- April 30, 2019

23. According to documents, the referral referenced an allegation made by Mr. Marianito Ruiz (808218/988235B) that on April 12, 2013 he was assaulted by several unknown Correctional Officers.

24. I will note that I was retained in this case to opine on the internal affairs investigation procedures and not the use of force application in this incident.

25. An Internal Affairs investigation is an administrative investigation as opposed to a criminal investigation and their objective is to find the truth; typically to determine whether there has been a violation of a policy, and then report their findings in a clear and thorough manner.

26. I reviewed the Internal Management Procedure #24 and #38 which describes the manner in which the SID obtains the authority to conduct these investigations and based on the documents I received; SID was properly authorized to conduct the investigation.

27. On April 15, 2013 Bayside prison Principal Investigator Crotty (PI Crotty) received reports stating that multiple Bayside Prison officers were accused of assaulting Mr. Marianito Ruiz. Industry standard teaches investigators that the first person interviewed should be the complainant. This assists the investigators in guiding them in the direction their investigation will proceed.

28. By interviewing the complainant in the beginning of the investigation, investigators will determine what elements are involved that would assist them in determining the truth of the allegation(s), based on the complainant's perspective. Investigators will start forming a list of those involved, as well as, a list of witnesses to the incident. These lists will be used to schedule future interviews of those allegedly involved depending on what part they played in the incident.

29. Based on the PI Crotty's report dated April 15, 2013, he interviewed the complainant, Mr. Ruiz, at the Southern State Correctional Facility (SSCF) where he was relocated after the incident for "Pre-Hearing Detention". During the interview Mr. Ruiz *"claimed that he had been assaulted by SCO Stretch, SCO*

*McCabe and additional custody staff whom he could not identify*". A written statement was obtained from Mr. Ruiz during the interview. After conclusion of the interview, PI Crotty forwarded his report to the SID at COHQ.

30. In SI Hepner's report she gave details referencing the report of PC Crotty stating important elements to the investigation. These elements I found important were Mr. Ruiz's observations leading up to, during and just after the alleged assault. Also, the fact that Mr. Ruiz was wanting to be relocated due to being viewed as a "snitch" by some inmates within the population.

31. SI Hepner obtained the photographs taken just after the incident and included them in her investigation file. Photographs of injuries are recommended after a use of force incident in order to preserve the actual severity of the injury instead of relying on verbal descriptions from witnesses.

32. On April 25, 2013 Mr. Ruiz was interviewed a second time. This interview was conducted by SI Hepner and Senior Investigator Valisa Leonard (SI Leonard) at the Northern State Prison (NSP) where he was currently being housed at the time her (SI Hepner) report was completed, according to documents I received.

33. Based on my observations the interview was conducted in a professional manner by SI Hepner and SI Leonard. At no point did I observe the investigators demeanor change as if to accuse Mr. Ruiz that he was giving false statements. On the other hand, Mr. Ruiz seemed to grow defensive as the interview progressed.

34. In my opinion, the interview completed by SI Hepner and SI Leonard gave Mr. Ruiz a clear opportunity to express the facts as he saw them from the incident that occurred on April 12, 2013. Clear, open ended questions were asked, answers

were received, follow up questions were asked and then the information obtained was documented in the report.

35. Based on the information received from Mr. Ruiz, stating that other inmates were present in the unit, interviews of these inmates were scheduled. This continues to follow the industry standard protocol of interviewing the plaintiff(s) first, followed by the witness(s), then ending with the person(s) accused of wrongdoing.

36. On April 29, 2013 SI Hepner and Principal Investigator Soltys (PI Soltys) interviewed the inmate workers handing/retrieving food trays in the unit on April 12, 2013 at the time the incident occurred. These inmates were out of their cells and would have had the opportunity to see the area where the incident took place.

37. On the same date other inmates within the unit were interviewed in order to gain any further information. According to SI Hepner's report, each inmate was interviewed separately. This gives the investigators the leverage of gaining information from inmates without the rest of the inmate population, or staff, identifying who gave the information.

38. Unfortunately, all inmates reported they saw nothing happen relating to a physical altercation between Mr. Ruiz and the officers in the unit. Information that was given by the inmates, which may confirm why they did not see anything was the policy of the facility having inmates drop to the ground and face away from the incident when a code was called.

39. Although this can lessen the number of witnesses with information on an incident, this is a security measure utilized by many correctional facilities, especially in prisons. Inmates are identified easily by responding officers as not being involved

in the incident which is reflected by lying on the ground.  The reasoning behind having inmates face away from the incident is also a security measure due to inmates are less likely to get involved if they cannot see what is occurring.

40. It is not uncommon to have inmates refuse to cooperate with investigations, whether they be criminal or administrative.  The "code of Silence" among inmates is an issue the investigator(s) must deal with anytime we are relying on inmate witnesses.  This can also be an obstacle with staff, depending on the facility culture.

41. As required by the New Jersey Internal Affairs Guidelines (11/2017/Introduction/Pg.5), *Where a preliminary investigation indicates the possibility of a criminal act on the part of the subject officer, the county prosecutor must be notified immediately. No further action should be taken, including the filing of charges against the officer, until the county prosecutor so directs.*

42. On April 30, 2013 SI Hepner forwarded her report, that was completed at that time, to Cumberland County Prosecutors Office for criminal review.  At this point it is industry standard that the administrative investigation be put on hold.  This normally occurs prior to staff interviews where compelled statements by staff should be conducted initially by the criminal investigators, if criminal charges are moving forward.

43. Based on documents I reviewed, she received notification on May 30, 2013 from Mr. Shapiro (First Assistant Prosecutor for Cumberland County) *"that there was insufficient evidence to establish criminal conduct and therefore, they would not be pursuing criminal charges at this time."*

44. Upon receiving notification that criminal charges would not be filed at that time, the administrative investigation can move forward, and staff interviews began on June 6, 2013.

45. Its noted in documentation, as well as audio/video recordings, that each staff member was advised of their Weingarten Rights after being informed why they were being interviewed.   The investigators had each employee sign a form reflecting they understood those rights.   **NLRB v. J. Weingarten,** *Inc. 420 U.S. 251* upheld a National Labor Relations Board decision that employees have a right to union representation at investigatory interviews

46. This was accommodated by allowing the officers to have a PBA Union Representative present during the interview.

47. On June 6, 2013 Senior Investigator Manera (SI Manera) and SI Hepner interviewed Sgt. Boaggio, SCO Carsten, SCO Parker, and SCO Williams.

48. According to documentation, these four (4) officers arrived in Unit E to escort Mr. Ruiz to medical for assessment.  These officers reported they did not witness, nor were involved, in the incident that occurred between custody staff and Mr. Ruiz in Unit E.

49. On June 7, 2013, SI Hepner and PI Soltys interviewed SCO Cooper, SCO Arrowood, SCO Reeves and SCO McCabe.  These staff were asked open ended questions and allowed to articulate what they observed and the actions they took in the incident with Mr. Ruiz on April 12, 2013.

50. Investigators utilized follow up questions based on the officer's answers and at times used leading questions in order to elicit more detailed answers from the

interviewees. Although leading questions are not recommended during interviews, when the interviewee is being vague or not being clear in their answers, they will assist the interviewer in obtaining details needed for the investigation, especially when the interviewee has previously given a written statement.

51. Formulating questions based on a previous written statement given by the interviewee, even if "leading" in nature, is permitted because the interviewer is not truly suggesting any answers, but attempting to elicit more detail based on the information already provided by the interviewee from his report.

52. Its noted that the interviews of SCO McCabe, SCO Tongo and SCO Stretch were audio and video recorded but due to the files being corrupted, these recording were lost. This unfortunately is something we must deal with in today's fast-moving world of technology. This can cause issues for the investigators due to the appearance of wrongdoing by the investigators. I found no reason in my review of this investigation to have me conclude that any investigator involved in this incident intentionally corrupted these interviews or were part of any coverup related to this investigation. Even so, they still summarized the content of the interviews in the SID final report.

53. Based on written material I found the interviews of these officers were consistent with the others therefore not alerting the investigators to any misconduct.

54. On July 22, 2013 SI Hepner and PI Soltys interviewed Sgt. Ryan, the responding commander to the incident on April 12, 2013. Again, open ended questions were asked, and the officer was able to express his statement freely. His statement was also consistent with the statement of other officers.

55. It is my opinion, based on my specialized background, education, training and experience, as well as my continued research and training that the Internal Affairs investigation conducted SI Hepner, PI Soltys, SI Manera and SI Leonard was completed in an organized and professional manner. Questions were asked and follow up questions were utilized in order to gain the information needed to determine the facts. Overall, it was an objectively reasonable investigation and conducted in accord with the accepted practices and procedures.

56. An investigation conducted by an Internal Affairs Unit is an administrative investigation to find the truth; typically to determine whether there has been a violation of policy. I found, based on my review of the material, this was a timely, sufficiently thorough, impartial investigation whereby all witnesses were interviewed and given the opportunity to articulate the facts as they knew them, and the investigation answered the questions posed to it by the allegations.

57. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool(s); I will make them available for review, if requested, prior to their use.

58. My fees for these professional services are based upon a flat fee of $250.00 per hour, including deposition preparation and testimony. Trial testimony and services will be $2500 per 8-hour day of testimony. Reasonable out of pocket expenses are billed related to the services provided.

Dated 30th. Day of May 2019                    *s/Jeffrey S. Carter*
                                                Jeffrey S. Carter